# IN THE COURT OF APPEALS OF IOWA

_____

No. 24-1531
Filed March 11, 2026

_____

**State of Iowa,**
Plaintiff–Appellee,

v.

**Ray Myron Rice Jr.,**
Defendant–Appellant.

_____

Appeal from the Iowa District Court for Polk County,
The Honorable David Nelmark, Judge.

_____

**CONVICTION AFFIRMED, SENTENCE VACATED IN PART,
AND CASE REMANDED**

_____

Karmen R. Anderson, Des Moines, attorney for appellant.

Brenna Bird, Attorney General, and David Banta, Assistant Attorney
General, attorneys for appellee.

_____

Considered without oral argument
by Schumacher, P.J., and Badding and Langholz, JJ.
Opinion by Langholz, J.

**LANGHOLZ, Judge.**

A jury convicted Ray Rice Jr. of domestic-abuse assault while displaying or using a dangerous weapon for attacking his mother with a machete and wounding her hand.[1] *See* Iowa Code §§ 708.1(2), 708.2A(2)(c) (2023). Rice appeals his conviction, challenging the sufficiency of the evidence. And he appeals his sentence, challenging a provision in a no-contact order that found he and his mother were "intimate partners" and another prohibiting him from possessing a firearm based on that finding. Because substantial evidence supports the jury's verdict, we affirm Rice's conviction. And we accept the parties' agreement that there is no factual basis for the intimate-partner finding. So we vacate the no-contact order's intimate-partner finding and its firearm prohibition based on that finding and remand for the district court to enter a corrected no-contact order.

## I. Sufficiency of the Evidence

We review Rice's challenge to the sufficiency of the evidence supporting his conviction for domestic-abuse assault while displaying or using a dangerous weapon for correction of errors at law. *See State v. Crawford*, 972 N.W.2d 189, 202 (Iowa 2022). We are bound by the jury's verdict "if the verdict is supported by substantial evidence." *Id.* Evidence is substantial when "sufficient to convince a rational trier of fact the defendant is guilty beyond a reasonable doubt." *Id.* It matters not whether the evidence is direct or circumstantial. *See State v. Ernst*, 954 N.W.2d 50, 57 (Iowa 2021).

---

[1] Rice was also convicted of going armed with intent, felon in possession of a firearm, and trespass for his other actions the morning of the assault. *See* Iowa Code §§ 708.8, 716.7, 716.8, 724.26(1). The district court imposed a two-year indeterminate prison sentence on the domestic-abuse-assault conviction consecutive with a total of another ten years on the other convictions.

And in assessing its sufficiency, we view "the evidence in the light most favorable to the State" and make all "legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence." *State v. Brown*, 5 N.W.3d 611, 615–16 (Iowa 2024) (cleaned up). So even if "the evidence would support a different finding," that does not mean it is "insubstantial"—"the ultimate question is whether it supports the finding actually made." *Id.* at 619 (cleaned up).

Over a three-day trial, the jury heard evidence that Rice and the victim—his then-seventy-five-year-old mother—showed up at the house where Rice's nephew was living early one May 2023 morning. When the nephew answered the knock at the door, he saw the victim—the nephew's grandmother—standing there with blood on her face and hand. Before he could speak, she told him, "Call the cops. Junior's got a gun." Moments later, Rice emerged from the car they had arrived in and began repeatedly shouting "where's my grandpa's will?" as he pointed a gun toward the nephew.

As Rice continued shouting at his nephew, he pulled the gun's trigger twice. The first time, the gun clicked but did not fire a live round. The second, it shot a bullet into the door jamb. The victim shrieked and flinched as the gun fired near her head. Rice continued to yell, briefly stepped into the house, and then left in the car with the victim.

Rice's nephew indeed called the police. And police officers and paramedics soon arrived at the house where Rice and the victim lived together. The victim told them that Rice had fled with the gun, a machete, and her phone as soon as they returned home. She also told an investigating officer that Rice had injured her face and hand. And the officer observed bleeding on the victim's face and hand and lacerations on her knuckles.

The victim told the paramedics that she did not want to go to the hospital. When asked about her face injury, she said, "He head-butted me." And when a paramedic asked about her hand, she responded, "Oh, that was a machete." This encounter with the paramedic was captured on a bodycam video that was shown to the jury. The paramedic also observed that her hand has "superficial lacerations" that would have been consistent with being "hit with a blunt object" and "[a] defensive wound." And the paramedic bandaged up the hand wound.

The victim's daughter soon arrived. The nephew (her son) had called her too. She observed that the victim was "Scared—like, she was walking back and forth in circles, shaking, kind of not being able to catch her breath, yet her breath—crying" and "[n]ot herself." The victim told her daughter that Rice "head-butted her, hit her." She also told her daughter that Rice injured her hand with "a machete," explaining he "swung a machete, and she lost her balance and grabbed the deep freeze." When pressed on cross-examination about precisely what the victim said, she testified that the victim said Rice "swung the machete at her and missed and it hit the deep freeze."

Police officers eventually found Rice in a wooded area near the victim's house. He was arrested and taken to the county jail. Upon his release, the victim's daughter gave him a ride to a family friend's house. Along the way, Rice told her that he needed to "get some things" first and had her stop near a wooded area. Rice left her car and came back with a gun and a machete. She told Rice that she would take care of disposing of them. But instead, she eventually turned the gun and machete over to law enforcement.[2]

---

[2] She did so in the middle of Rice's first trial on these charges—the night before she was supposed to testify. Rice then successfully moved for a mistrial.

To convict Rice of domestic-abuse assault while displaying or using a dangerous weapon under Iowa Code section 708.2A(2)(c), the jury must have found—as it was instructed—that the State proved four elements beyond a reasonable doubt: (1) "On or about May 15, 2023, [Rice] either did an act which was meant to cause pain or injury, result in physical contact which was insulting or offensive, place [the victim] in fear of immediate physical contact which would have been painful, injurious, insulting or offensive to [the victim], or displayed in a threatening manner a dangerous weapon toward [the victim]"; (2) Rice "had the apparent ability to do the act"; (3) "At that time, [Rice] used or displayed a dangerous weapon"; and (4) "The act occurred between family members who resided together at the time of the offense." *See State v. Mathis*, 971 N.W.2d 514, 518 (Iowa 2022) (explaining that unobjected jury instructions become "the law of the case for purposes of reviewing the sufficiency of the evidence").

The State presented evidence and argument about multiple ways that Rice committed this offense. But we focus on the most straightforward: he struck the victim's hand with a machete intending to cause injury or pain and indeed actually caused bleeding lacerations on her knuckles. If Rice did so, the conduct easily satisfies all the elements of the offense.

Rice challenges the evidence supporting the first three elements of the offense.[3] But his arguments essentially boil down to the one: that "all we have is mere suspicion and speculation" that he ever struck the victim with a machete. To be sure, the jury had no video showing the assault and it did not

---

[3] Rice does not challenge that he and the victim were family members who resided together at the time. Neither does he challenge that the machete was a dangerous weapon. *See* Iowa Code § 702.7; *State v. Franklin*, 368 N.W.2d 716, 719 (Iowa 1985) ("A machete is a dangerous weapon.").

get to hear in-court sworn testimony from the victim or anyone else who directly witnessed what caused the victim's hand injuries. But there was still substantial direct and circumstantial evidence that Rice hit his mother's hand with a machete with the intent to injure her.

For starters, the jury saw a one-minute clip of bodycam video of the victim talking to a paramedic about how she was injured. So the jury heard directly from the victim's mouth that Rice "head-butted me." It heard her answer a question about her hand by saying, "Oh, that was a machete." And the jury saw photos of her bloodied face and her bandaged hand.

The jury also heard much testimony from those who talked to and observed the victim that morning. The paramedic elaborated on the video, explaining that he observed "superficial lacerations" on the victim's hand that would have been consistent with being "hit with a blunt object" and "[a] defensive wound," and that he ultimately bandaged her hand. A police officer also testified that she observed bleeding on the victim's hand from lacerations on her knuckles and that the victim told her that Rice had injured her face and hand and had fled the house with the machete. So too did the victim's daughter testify that the victim told her Rice injured her hand with the machete.

What's more, the jury heard testimony that after fleeing with the machete, Rice hid it and then asked the victim's daughter to dispose of it. And the jury saw the machete that she turned over to police rather than disposing. Such conduct by Rice evinces consciousness of guilt, from which the jury could infer that Rice used the machete in his assault on the victim. *See State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993) (reasoning that a jury could have inferred guilt from the defendant's conduct leaving "the scene immediately after the shooting" and "hid[ing] his gun in the basement").

6

Viewing all this evidence in the light most favorable to the State, it was sufficient to convince a reasonable jury beyond a reasonable doubt that Rice committed domestic-abuse assault while displaying or using a dangerous weapon. And so, we affirm Rice's conviction for that offense.

## II.    No-Contact Order's Intimate-Partner Finding and Firearm Prohibition

Rice also challenges two provisions of the no-contact order protecting the victim, his mother. First, he argues that the record lacks any evidence to support the order's finding that he and his mother "meet the definition of intimate partners as defined in 18 U.S.C. § 921(a)(32)." *See* 18 U.S.C. § 921(a)(32) (defining "intimate partner" as "the spouse of the person, a former spouse of the person, an individual who is a parent of a child of the person, and an individual who cohabitates or has cohabited with the person"). And second, he argues that the order's prohibition of the possession of firearms and directive to deliver all firearms to the sheriff, which are based only on that finding, are thus illegal. The State concedes that the intimate partner finding is in error and must be vacated.

Because this no-contact order was incorporated into the sentencing order and it imposes an independent firearm prohibition and related duties on him, it is a term of Rice's sentence that can be challenged on direct appeal. *See State v. Kieffer*, 17 N.W.3d 651, 662–63 (Iowa 2025). And this is so even though he did not object in the district court. *See id.* at 661. We review Rice's challenge to the legality of the no-contact order for corrections of errors at law. *See State v. Rasmussen*, 7 N.W.3d 357, 365 (Iowa 2024).

To start, we accept the parties' agreement that Rice and his mother are not intimate partners under federal law and the contrary provision in the no-contact order must be vacated. *See State v. Hellman*, No. 18-1179, 2020 WL

110283, at *4 (Iowa Ct. App. Jan. 9, 2020) (vacating intimate-partner finding of no-contact order based on the parties' agreement that it lacked any factual basis). It is unclear whether the State agrees that the no-contact order's firearm prohibition based on that intimate-partner finding must also be vacated.[4] But regardless, Rice is correct that it must. The no-contact-order expressly ties the two provisions together—mandating the prohibition if the court makes the intimate-partner finding—and cites only the federal statute governing no-contact orders that protect intimate partners as the authority for the prohibition. And "[w]ithout the intimate-partner finding, we see no basis for an order concerning firearms." *Id.*

To be clear, Rice received notice that his convictions subject him to a firearm prohibition under other statutes and regardless of the terms of the no-contact order. *See* 18 U.S.C. § 922(g)(1), (9); Iowa Code § 724.26(1). But that does not mean that the district court has the authority to add an independent firearm prohibition to "a no-contact order—the violation of which could carry its own independent penalties" merely because of those convictions. *Hellman*, 2020 WL 110283, at *4. We thus vacate both the intimate-partner-finding and firearm-prohibition parts of the no-contact order and remand for the district court to issue a corrected no-contact order.

**CONVICTION AFFIRMED, SENTENCE VACATED IN PART, AND CASE REMANDED.**

---

[4] While the State highlights the other statutory grounds for a firearm prohibition, it never addresses whether those statutes authorize the imposition of an independent firearm prohibition as a term of the no-contact order. Neither does it clearly express any position on whether that term in the no-contact order should be vacated. So we cannot tell whether the State's argument about the firearm prohibition is focused on the term of the no-contact order or merely defending the applicability of the other statutory prohibitions.